ETHEL SAUNDERS BUTLER v. EUGENE STOKES BUTLER.

(Filed 12 June 1968.)

1. **Divorce and Alimony § 16—**   **Evidence held sufficient for jury in action for alimony without divorce based upon indignities to the person.**

In an action for alimony without divorce pursuant to G.S. 50-16 [now repealed], evidence of the wife that during the week that she and defendant husband lived together after their marriage he repeatedly requested that she assure him that she would be true and faithful to him and that she reiterate her marriage vows, that he repeatedly told plaintiff to talk

to no one without his consent and that if she wanted to go to the store he would go with her or send someone, that defendant locked the door and would not allow her to leave, that defendant would allow her to watch only certain television programs, that defendant frequently told plaintiff about unfaithful women being shot and showed guns to her, that the last night she lived with defendant he had her repeat her marriage vows at least every hour, that plaintiff performed general housekeeping during the week of the marriage, and that she was not unfaithful and did not quarrel with defendant, *is held* sufficient to be submitted to the jury on the issue of whether defendant offered such indignities to the person of plaintiff so as to render her condition intolerable and her life burdensome.

**2. Same—**

An action for alimony without divorce under former G.S. 50-16 based upon indignities to the person of the plaintiff may be instituted as soon as the grounds have occurred, the period of time during which the indignities must have continued and persisted not being fixed by any specific test, it only being necessary that they have been repeated and continued for such time as to render the injured party's condition intolerable and burdensome.

APPEAL by plaintiff from *Johnston, J.,* 4 December 1967 Civil Session of FORSYTH County Superior Court.

This action for alimony without divorce was commenced by the plaintiff on 30 March 1966. Alias summons was served on defendant 24 April 1966. Defendant filed answer 23 May 1966. Apparently, no motion for alimony *pendente lite* was made by plaintiff, and on 3 July 1967 the defendant moved and was later allowed to amend his answer so as to set up a cross action for divorce on the grounds that the parties had lived separate and apart from each other for more than one year. Upon the call of the case for trial, the parties stipulated, among other things, that "the plaintiff's cause of action is bottomed on one for alimony without divorce as alleged in the plaintiff's complaint, and that the defendant's action is one for an absolute divorce as alleged in the cross action."

From a judgment of nonsuit as to plaintiff's cause of action, an adverse jury verdict and judgment of absolute divorce on defendant's cross action, the plaintiff appeals.

*W. Scott Buck for plaintiff appellant.*
*Gwyn & Gwyn by Julius J. Gwyn for defendant appellee.*

MALLARD, C.J.  This case was brought and is decided under the provisions of G.S. 50-16. This statute was repealed, effective 1 October 1967, by Chapter 1152 of the 1967 Session Laws. This repealing act was ratified 6 July 1967 and provides that it does not apply to pending litigation.

The pertinent parts of the controlling statute provide that if any husband shall separate himself from his wife and fail to provide her with the necessary subsistence according to his means and conditions in life and "be guilty of any misconduct or acts that would be or constitute cause for divorce, either absolute or from bed and board, the wife may institute an action in the superior court of the county in which the cause of action arose to have a reasonable subsistence and counsel fees allotted and paid or secured to her from the estate or earnings of her husband, or she may set up such cause of action as a cross action in any suit for divorce, either absolute or from bed and board; and the husband may seek a decree of divorce, either absolute or from bed and board, in any action brought by his wife under this section." G.S. 50-16.

Plaintiff alleges two causes constituting grounds for divorce from bed and board which are, as set out in G.S. 50-7, "if either party abandons his or her family" or "offers such indignities to the person of the other as to render his or her condition intolerable and life burdensome."

In a lengthy and detailed complaint plaintiff alleges that the defendant by his conduct turned the plaintiff out of doors and drove her away from his home. However, in her brief she contends that her cause of action "stands or falls" upon the allegation and evidence relating to the question of whether the defendant offered such indignities to her person so as to render her condition intolerable and her life burdensome. The plaintiff has limited the question on appeal to a determination of whether the trial judge erred in entering a nonsuit of her action.

> "When a wife bases her action for alimony without divorce upon one of the grounds listed in the statute pertaining to a divorce from bed and board, she must 'meet the requisite' of N. C. Gen. Stat. § 50-7 and the decisions that have interpreted it. For example, if she alleges cruel treatment or indignities, she not only must setout with particularity the acts which her husband has committed and upon which she relies, but also must allege, and consequently offer proof, that such acts were without adequate provocation on her part." *2 Lee, North Carolina Family Law,* § 141 (3rd ed. 1963).

The following is a summary of the evidence except when quoted. Plaintiff, who was 54 years of age, and defendant, who was about 65 years of age, were married on Friday, 28 January 1966. Plaintiff had been married twice before, and defendant had been married to plaintiff's sister for many years prior to her death in the summer of 1965. Plaintiff and defendant had not seen each other or written

to each other after defendant's wife's death until after Christmas in 1965 when plaintiff and another sister of hers went to visit the defendant in his home. Defendant had just had an operation to remove a cataract from his eye, and he was experiencing some difficulties there in his home. He and an afflicted son, Tony, were living together. The defendant and his first wife, plaintiff's deceased sister, had eleven children, all of whom were living at that time.

Immediately after plaintiff and defendant were married, they went to the defendant's home in Caswell County. When they arrived, she found that her dead sister's clothes, flowers and other personal effects were still in the house.

On Saturday, the day after the wedding, there came a severe snow storm and more snow fell the following week. Her husband did not want her to go outside, and she didn't go outside; "it was too bad out."

On Monday defendant's children came and took their mother's clothes out. Some of the defendant's children were in and out of the house during the day, but in the late afternoon after they all went home, the defendant locked the door and repeatedly requested plaintiff to assure him she would be true and faithful to him. He asked her not to talk to people unless he told her to, and warned her to lock the door and not let anybody in except the family when he was away. He told her he wanted her to do her shopping in Reidsville instead of Burlington and that if she wanted something from the grocery store, he would go with her or would send somebody. Beginning on her wedding day and every day during the ensuing week, he repeated the foregoing to her. They sat up sometimes until twelve o'clock and would watch television programs that he wanted to see, but he did not approve of her watching television except certain programs.

He asked her frequently to repeat her marriage vows. On the day of their marriage he asked to see some rings she had bought for herself. She gave them to him, and he kept them until Thursday. He told her that a man had given her the rings. He asked about her fur coat and did not believe her when she said she bought it.

Plaintiff rearranged chairs and moved some dishes, and he put them back where they had been. The plaintiff testified:

"On Wednesday night. (sic) Mr. Butler didn't feel good and I did all I knew to do for him, what he said. Then Thursday evening late, I told him I thought I would go home and I was just upset and I had a sore throat and I wanted to go home and I wanted a doctor and I wanted to think it over; that there was something wrong with our marriage. He didn't agree with me,

BUTLER *v.* BUTLER.

but I asked could I have the car to go home. He said no, I couldn't. So I called my daughter and she wanted to come and get me. I told her no, I would stay till Friday. So I talked to her a while, and then he kept me awake all night long. I didn't sleep any Thursday night. He wanted me to say my marriage vows. And even if I dozed a little bit, he'd call me. He'd ask me where something was. He'd tell me, now, I knew my marriage vows and I knew that I was supposed to be a faithful and loving wife and why was I going. I told him I couldn't live like that; that something was happening to us; that he didn't understand me and I didn't think he really loved me. He said he did. And we just continuously went that way all night long. Then he complained with his heart hurting. He wanted me to put some salve on him, which I did. He wanted medicine. He took different medicines, all kinds. I didn't know his medicine. He wanted me to get some of his wife's *(sic)* medicine and give him. I wouldn't do it; I told him he shouldn't take it, that something might happen to him, and I didn't give him that medicine. Throughout Thursday night, I repeated some portion of my marriage vows at least every hour. . . .

My reasons for not going back were that I couldn't go through the mental torture no more. Just every night as quick as he would lock that door he'd just have to go through just every thing over and over about I married him and I was supposed to be faithful, and he'd tell me about how women would get shot in the face for not being faithful and he knew that the men got off free, and he showed me guns and all of that stuff. I didn't want to go back and go through that any more.

In the course of my telephone conversation with him on Sunday night I said something to him then about coming and talking with me about the situation, but he wouldn't listen to me. He talked continuously about my duty was to come back to him."

Plaintiff's evidence also tended to show that she performed general housekeeping work during the week of the marriage, that she was not unfaithful, and that she did not quarrel with the defendant. And the defendant did not quarrel with her; he just told her what to do.

On Friday morning, 4 February 1966, she returned to Walkertown with her son-in-law, and she has not been in good health since. From 4 February 1966 she and the defendant have lived separate and apart from each other.

In 1 Lee, North Carolina Family Law, § 82 (3rd ed. 1963), we find the following:

"The period of time during which the indignities must have continued and persisted is not fixed by any specific test. They must be repeated and continued for such time as to render the injured party's 'condition intolerable and burdensome.' The ground of 'indignities to the person' is not directed at isolated instances, but at a course of conduct that is repeated and continued for some time. . . .

In an action for alimony without divorce under N. C. Gen. Stat. § 50-16, which, among other things, may be based upon a cause which constitutes a ground for divorce from bed and board, the plaintiff is not required to set forth in her complaint that the facts have existed for at least six months prior to the filing of the complaint, as is required under N. C. Gen. Stat. § 50-8 in an action for divorce. The plaintiff can properly institute such action as soon as the grounds have occurred or are discovered. The verification of the complaint is the same as in ordinary civil actions."

We hold in this case that the evidence taken as true and in the light most favorable to the plaintiff is sufficient to require the submission to the jury the question of whether the conduct of the defendant was such that it resulted in the offering of indignities to the person of the plaintiff so as to render her condition intolerable and life burdensome. The judgment of compulsory nonsuit is reversed.

In view of this disposition of the plaintiff's case, the verdict of the jury on the issues submitted and the judgment for absolute divorce signed herein are set aside and the cause is remanded for a new trial on all of the issues necessary to settle the controversies arising on the pleadings.

New trial.

BROCK and PARKER, JJ., concur.